No. 3776.—HEIRS OF JACOB HOOVER v. YORK AND HOOVER et als.

The omission of a notary public in writing a nuncupative will by public act, to use the expressions "as dictated," is not good ground for annulling the will. These expressions are not sacramental, and if the notary uses other language which conveys the same idea, the will is not void because these expressions are not used.

An illegal disposition in a will to a legatee by particular title does not destroy or impair the rights of the legatee by universal title.

A particular legacy that has lapsed, because of the incapacity of the legatee to take, enures to the advantage of the universal legatee.

APPEAL from the Thirteenth Judicial District Court, parish of Concordia. *Hough, J. George S. Sawyer,* for plaintiffs and appellees. *C. Roselius, Ogden, Sparrow* and *Henry B. Shaw,* for defendants and appellants. *Mayo & Spencer,* for Ober & Atwater.

WILY, J.. The motion to dismiss this appeal is denied, because, if the bond is not sufficient for a suspensive appeal, being for the amount fixed by the judge, it is good for a devolutive appeal.

In August, 1859, Jacob Hoover died, leaving a large estate; and having no forced heirs he instituted Ze ulon York and E. J. Hoover his universal legatees, bequeathing to them his entire property, in a nuncupative will by public act executed before —— Gottschalk, notary, in the city of New Orleans, on the twenty-sixth of January, 1859. The will was duly proved and ordered to be executed, and the said universal legatees were recognized and put in possession of all the property left by the deceased.

The estate consisted mainly of the White Hall, the Home and the Marengo plantations in the parish of Concordia, together with some five hundred slaves and the movable property employed on said plantations.

. The said universal legatees sold the Marengo plantation to James T. Organ in January, 1866; he subsequently conveyed it to Wm. Shorter. In 1866 they mortgaged the balance of the property to Ober, Atwater & Co., to Alexander Allen and to the firm of Wright, Allen & Co., for sums amounting in the aggregate to upwards of $200,000.

On the twenty-seventh of May, 1868, Zebulon York and E. J. Hoover were declared bankrupts by the United States District Court. They surrendered as their property the White Hall and Home plantations. This property was sold by order of the Bankrupt Court, and was adjudicated to Albert G. Ober, who is now in possession as owner, jointly with Frank D. Atwater.

On the thirteenth of December, 1859, the plaintiffs claiming to be the legal heirs of Jacob Hoover, deceased, brought this suit against York and Hoover, the universal legatees, to recover the property left by the deceased, and to annul his will.

The grounds of nullity are, that the will was not executed with the formalities prescribed by article 1571, Civil Code; especially there is no express mention that the testament was written by the notary "as dictated" by the testator, and also that the recitals of the notary are untrue.

The testimony of the notary, and also of the three attesting witnesses, shows beyond doubt that the recitals of the will are true.

Article 1571, Civil Code, provides that, "The nuncupative testaments by public act must be received by a notary public, in the presence of three witnesses residing in the place where the will was executed, or of five witnesses not residing in the place.

This testament must be dictated by the testator, and written by the notary as it is dictated. It must then be read to the testator in the presence of the witnesses.

Express mention is made of the whole, observing that all those formalities must be fulfilled at one time, without interruption and without turning aside to other acts.

It must appear by the act itself that the formalities required by law have been complied with.

The main ground of the plaintiffs is, that there is no express mention that the will was written " as dictated."

There is no particular virtue in the words " as dictated;" they are not sacramental; any language conveying plainly the same idea is just as good.

The will before us declares that Jacob Hoover, in the presence of the witnesses, appeared before the notary, and " did require of me, notary, to receive his last will, which he thereupon immediately dic tated unto me in the presence of the above named witnesses, in the following words to wit: " My name is Jacob Hoover. I am a native of Jackson county, in the State of Georgia. &ast; &ast; &ast; My father and mother are both dead. I was never married and have no children. I give and bequeath unto Elias J. Hoover and Zebulon York, both residing in the parish of Concordia, all my real, personal and mixed estate, and property of whatever nature or kind, and wheresoever situate; the whole consisting of &ast; &ast; &ast; &ast; &ast; &ast; &ast; Moreover, I nominate and appoint the said E. J. Hoover and Zebulon York to be my testamentary executors and detainers of my estate, with full power to regulate the same without the intervention of justice. I hereby revoke all wills and testamentary dispositions heretofore made, holding these presents alone for valid. Thus the foregoing will has been dictated to me, notary, by the said testator, in the presence of the above named witnesses, and I have written the same in their presence immediately, without interruption or turning aside to other acts, and in my proper handwriting, and having read said will to said testator in a loud and audible voice, in the presence of said witnesses, he declared unto me in their presence that he perfectly and fully understood the same, and persisted therein." This done and passed &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

We think the formalities required by article (C. C.) 1571, are fully complied with in the will before us.

Here the notary states that the testator appeared and " *did require of me, notary, to receive his last will, which he thereupon immediately dictated to me* &ast; &ast; &ast; *in the following words to wit:*"

The dispositions of the testator are then written, and the notary concludes as follows:

" *Thus the foregoing will has been dictated to me, notary, by the said testator,* &ast; &ast; &ast; *and I have written the same immediately.*"

If the will was dictated by the testator *and written in his own words immediately*, it must have been written as dictated.

There is no force, therefore, in the position that the formalities of law have not been observed in making the will. On this ground alone its nullity was sought in the original petition.

But after York and Hoover, the original defendants, had mortgaged White Hall and Home plantations for more than they were worth, and finally surrendered them in bankruptcy, and after they had been purchased by Ober &. Atwater, mortgage creditors of said York and Hoover, Elias J. Hoover informed the attorney of plaintiffs that he and York never had a valid title to the property left by Jacob Hoover, because there was a counter letter, which is now lost, which contained the real purpose of the testator. It was his real purpose to put the property in the hands of York and Hoover, as trustees. They were to hold the property for the real beneficiary heir, James Hoover, an illegitimate son of the deceased by his colored concubine and slave, Lydia; that this child, about two years old at the death of Jacob Hoover, was to receive all the property from said York and Hoover on arriving at twenty-one years of age, and they were merely parties interposed.

On the eighth of May, 1870, the plaintiffs amended their petition, propounding this new ground of nullity, and citing Norton, the asignee of York and Hoover, and also Ober & Atwater, the purchasers of White Hall and Home plantations.

No one ever saw or heard of the pretended counter letter but York and Hoover.

We have no hesitatancy in saying that the witness, Elias J. Hoover, from his acts and his contradictory oaths contained in the record in reference to the property in dispute, is utterly unworthy of credit in a court of justice. He obtained a large amount of money from the defendants, Ober & Atwater, and also from other parties on the faith of his deliberate declarations in acts of mortgages that he was the joint owner of the property; and finally, to get relief from his creditors he voluntarily goes into bankruptcy with York, placing White Hall and Home plantations on the schedule as their property, and swearing to the correctness thereof.

He has made two contradictory oaths as to the missing counter letter, one of which he voluntarily furnished the counsel of the plaintiffs when they amended their petition on the eighth of May, 1870, and the other at the trial. He is evidently anxious for his relatives and co-heirs now to recover the property, after realizing himself all he could out of it, and after practicing a deliberate fraud upon Ober & Atwater, and other parties.

But assuming the statements of York in reference to the counter letter to be true, let us inquire what effect it had upon the title of York and Hoover to the property in dispute, to which Ober & Atwater have succeeded, so far as concerns White Hall and Home plantations, and to which Wm. Shorter has succeeded, so far as concerns the Marengo plantation.

York gives the following as the substance of the missing counter letter, viz.:

"The counter letter contained, as near as I can recollect, the following words, to wit: 'I, Jacob Hoover, do desire and wish that the proceeds resulting from the annual sales of my cotton crops shall be disposed of: *First*—In purchasing servants, slaves and mules, to cultivate all the vacant land or uncultivated lands on White Hall and Home Place; and further, to build houses for said servants, and stables for said mules, and generally to improve said plantations by putting them in the best possible repairs. *Second*—After White Hall and Home Place have been put in the best repairs as above stated, then the annual net revenues shall be at the disposal of Z. York and Elias J. Hoover, as they may decide in their own judgment, either in purchasing city lots, Texas land, or desirable plantations in this State. Should the said Z. York and E. J. Hoover find it, in their opinion, necessary to mortgage any of my property, I wish them to do so, *to procure money, at a low rate of interest, from any bank or commission merchant, to carry out their investments or perfect their purchases. Third*—My boy Jimmy, or James Hoover, I wish and do desire to have sent to school, and no means or expenses spared in having him thoroughly educated. And when he shall arrive at the age of twenty-one years, I desire and wish that said Z. York and E. J. Hoover shall turn over and put him in possession, of his own right, White Hall and Home Place; that is, should he be capable of protecting and not squandering the same. Should he, James Hoover, at the age of twenty-one, be a reckless man or an imbecile, I request that none of my property be put in his possession; but Z. York and E. J. Hoover shall amply provide for his support and maintenance. In case of the death of my son, James Hoover, and my woman Lydia shall be the mother of no more children during my lifetime, all my property shall belong absolutely to Z. York and E. J. Hoover. Agreed to and signed this twenty-seventh day of January, 1859.'"

This witness also states that neither he nor E. J. Hoover ever exerted any influence on Jacob Hoover to make his will; he "don't think anybody on earth could have influenced him to do otherwise than he desired." He also states that "Elias J. Hoover and witness were to judge, when the boy came of age, whether he was capable of taking and managing the property.

There was no event or contingency mentioned in that counter letter upon which the boy James was to receive from us other property than the White Hall and Home places."

It will be observed that by the counter letter the testator did not intend that his illegitimate son by his slave Lydia should be his universal legatee, because "there was no event or contingency mentioned

in that counter letter upon which the boy James was to receive from us (the universal legatees) other property than the White Hall and Home Place." If the disposition in favor of this illegitimate child had been embodied in the will (and it can have no greater effect in the counter letter) it would be no cause to annul the will. The lapse of a particular legacy by reason of the incapacity of the party to take, enures to the advantage of the universal legatees. An illegal disposition to a legatee by particular title does not destroy the will; it can not defeat the right of the heirs by universal title. That Elias J. Hoover and Zebulon York were the universal legatees of Jacob Hoover, deceased, there can be no doubt.

The value of the property left by the deceased exceeded a million of dollars. By the terms of the will Elias J. Hoover and Zebulon York were instituted heirs by universal title. They were not merely parties interposed. They were to be the owners of this vast estate, except, perhaps, the White Hall and Home Place, which they were to turn over to the boy James when he arrived at the age of twenty-one years, provided "he be capable of protecting and not squandering the same," and of this the said universal legatees were to be the sole judges.

Whether James was to get White Hall and Home Place depended on several conditions, viz.:

*First*—That he should live to be twenty-one years of age.

*Second*—That he be judged by the universal legatees on arriving of age to be capable of protecting and not squandering it; and of this said legatees were to be the sole judges.

All the other property was bequeathed to York and Hoover unconditionally, and the part intended for James was also to be theirs, provided certain conditions should not happen.

"Every disposition in favor of a person incapable of receiving shall be null, whether it be disguised under the form of an onerous contract or made under the name of persons interposed." C. C. 1478.

"The testamentary disposition falls when the instituted heir or the legatee rejects it, or is incapable of receiving it." C. C. 1696.

"The legatees under a universal title, and legatees under a particular title, benefit by the failure of those particular legacies which they were bound to discharge." C. C. 1697.

"Whenever a legacy falls for incapacity of the legatee, the universal legatee takes it to the exclusion of the collateral heirs at law." * *. * Prevost vs. Prevost, 10 R. 513.

The lapse of the particular legacy in favor of the boy James by reason of his incapacity, inured, therefore, to the advantage of York and Hoover, the universal legatees, and not to the plaintiffs, the collateral heirs at law of Jacob Hoover, deceased.

Our conclusion is that York and Hoover acquired by the will of Jacob Hoover a good title to all the property left by him.

We think the court *a qua* erred in giving judgment for the plaintiffs and against the defendants, Albert G. Ober and Frank D. Atwater, the owners of White Hall and Home plantations, and that it did not err in giving judgment against the plaintiffs and in favor of Wm. Shorter, the owner of the Marengo plan'ation.

It is therefore ordered that the judgment in favor of Wm. Shorter and against the plaintiffs be affirmed with costs; it is ordered that the judgment in favor of the plaintiffs and against the defendants, Albert G. Ober and Frank D. Atwater, be annulled; and it is now ordered that there be judgment for these defendants recognizing them as the legal owners of White Hall and Home plantations, and rejecting the demand of the plaintiffs with costs of both courts.

Rehearing refused.